Garth and Buckman *v.* Fort.

15L 683
4pi 596

GARTH, BUCKMAN *et al. v.* J. W. FORT *et al.*

1. DEED. *Feme covert. Privy examination.* If proper privy examination was made and an improper certificate made by mistake, same may be corrected; but if proper examination was not made, it cannot be cured. It is not incompetent for the officer to testify that the proper privy examination was not taken.

2. SAME. *Husband and wife.* If husband attempt to sell his wife's land, same is void, and the purchaser, if put in possession, is at most but the tenant of the husband, whose entry and possession is not a disseizin of the wife, if it is of the husband. In such case the *bona fide* purchaser is entitled to compensation for permanent improvements made before the filing of the bill to set aside the conveyances to the extent the value of the land is enhanced at the time of the surrender of possession, and will be charged with rents from the death of the husband, but is not entitled to lien on the land for purchase money paid the husband.

FROM ROBERTSON.

Appeal from the Chancery Court at Springfield. GEO. E. SEAY, Ch.

T. L. YANCEY, QUARLES & DANIELS and GARNER & GARNER for complainants.

J. W. JUDD for defendants.

TURNEY, J., delivered the opinion of the court.

In August, 1867, J. B. Fort died intestate, in Robertson county, leaving four children, viz: J. W. and J. H. Fort, Mrs. Garth and Mrs. Ligon. The children agreed to partition the lands, and on December 4, 1867, a deed *interpartes* to that end was prepared and purports to have been acknowledged by Mrs. Garth and Mrs. Ligon, on December 20, 1867.

Mrs. Ligon lived in Montgomery county; Mrs. Garth in Robertson. The other parties acknowledged the deed at different times.

It is claimed that on January 11, 1868, S. M. Ligon, with his wife, conveyed the parcel of land allotted to her, to J. W. Fort. The deed purports to have been acknowledged on privy examination by Mrs. Ligon, on April 23 or 25, 1868.

Mrs. Ligon died in 1871. Ligon died since the case was appealed to this court.

The children of Mrs. Ligon filed this bill in February, 1876, to stay waste, remove cloud, etc., making their father and the purchasers of the land defendants.

The clerk of the county court of Robertson county appointed W. R. Saddler, a justice of the peace for that county, to take the privy examination and acknowledgment.

The first question to be answered is, was the privy examination, etc., had in Robertson county? Upon this inquiry the proof is quite conflicting, respectable and credible witnesses testifying on each side of the issue.

It is admitted that Saddler took the acknowledg-

ments to both deeds—one at his own home, and the other at the home of Mrs. Ligon; that he was sick at home when he took one of them, and Mrs. Ligon sick at her home when he took the other, but it is controverted which.

The witnesses being equally credible, we must look to such circumstances as tend to strengthen the one side or the other. The attending physician proves that Saddler was sick, and that he visited him at his house on December 20; that he was his regular physician, and visited him in January, February and August, 1868; that during that and the preceding year he visited other members of Saddler's family; that his books show the times of his visits, and to whom made.

S. M. Ligon, the husband, says: "I kept a diary, generally as a farm diary, which enabled me to recollect and fix dates," and has it with him. The memoranda were made at the time, and are true. He says, Mrs. Ligon had an attack of apoplexy on the morning of January 4, 1868, and was never well afterward; at the time the deed to Fort purports to have been acknowledged, Mrs. Ligon was at home? one of her children (Matt.), was very sick; that Saddler came to his house about April 25 for the purpose of taking the acknowledgment, and said he came at the request of Fort; that Dr. Beaumont visited the child on April 23; Mrs. Ligon went to E. A. Fort's, which was in Saddler's neighborhood, on the 16th and returned December 17, 1867; Mrs. Ligon was in bed at the time of acknowledgment; *she was feeble,*

*mentally and physically, if not insane, after the attack, and was never left alone.*

These facts are corroborated circumstantially by others who were about the house or of the family, at the time mentioned, and we think show satisfactorily that Saddler took the acknowledgment to the partition deed at his home while he was sick, and to the Fort deed at Mrs. Ligon's home, in Montgomery county, when she was sick, and if so, the latter is void.

We next inquire, was the privy examination as required by law? The certificate by the commissioner is that he has "taken the examination of Mrs. S. C. Ligon separate and apart from her husband as to her free— in signing the above deed. This, April 25, 1868."

At the January term, 1876, of the county court, under proceedings for the purpose, the certificate was made to conform to the statute. This would do, provided the examination was properly taken, but an improper certificate made by mistake. A proper certificate cannot cure an imperfect or insufficient examination.

The commissioner is examined, and says Mrs. Ligon did not read the deed; he did not read it to her; that he supposed she understood what she was about; had but little conversation with her; did not have the statute before him at the time, but wrote from memory; that when the amendment proceedings were being had he had no more distinct recollection of what had passed than he now has.

Garth and Buckman *v.* Fort.

If the commissioner wrote, as he says, from memory, we must presume that he examined in the same way, and that his memory was no better when he examined than when he wrote, especially when the two constitute but one act.    The guard thrown around the married woman by the law, requiring the privy examination, is intended to furnish her the means of information necessary to a perfect understanding of the act she is called on to perform, and to protect her against her own ignorance of what may be the legal effect of her act, as well as against the superior knowledge, cunning and undue influences of others. Each of the qualifying words in the statute is essential to the validity of the deed of a *femme covert.* The absence of any one of them vitiates the deed. Such defects and omissions cannot be cured by subsequent amendment, however solemn, formal and free.

To the objection that the commissioner cannot be examined to impeach his official acts, there are two answers: First, he was called by the objecting party, and second, any evidence going to show a want of the invalidity of the privy examination is competent, and we know of no rule excusing an officer from stating such facts as will go to show a failure on his part to do his duty.    The objection is made for the first time in this court, and could not avail any way.

The defense of the statutes of limitation of three and seven years, cannot avail under the construction given to the act of 1849–50, Code, 2481.    In *Lucas v. Rickerich,* 1 Lea, 728, this court says: "In *Cole-*

*man* v. *Satterfield, et al.,* 2 Head, 264, this statute is correctly stated to have changed the common law by forbidding the sale of his (the husband's) interest during her (the wife's) life for his debts, and also disables the husband from selling such interest unless she joins in the conveyance. This, we have several times held, was the only effect of the statute, and that it did not create a technical separate estate in the wife. This being so, it follows, the rights of the husband as to rents and profits are not affected by the statute, and remain as before its passage."

If we adhere to this interpretation, it must result, that in order to secure the rents and profits, the husband must, of course, control the use and occupation, and that he is also, during the life of the wife, tenant by curtesy initiate, and upon her death, after issue born alive, he is tenant by curtesy. To them it must also result that while his attempt to sell is void, still if he put the purchaser in possession, that purchaser is his tenant, whose entry and possession is not a disseizen of the wife, even if we should hold it a disseizen of the husband, which I think it is not, but as the sale is void, he is a tenant at will, or at most, from year to year, of husband and wife. However this may be, the husband, being entitled as already defined, may put him in possession, and he holds alone under the husband, and only such interest as the husband had, and cannot be disturbed in his possession by the heir of the wife, as such, until the death of the husband, who having died after the wife, and since the commencement of this suit, no statute

Garth and Buckman v. Fort.

interferes with the rights of complainants, who had the right, as they have prayed, to stay waste, to remove cloud," etc., during the life of the husband, and to have their rights ascertained.

Under the rules, several times announced by this court, the defendants are entitled to compensation for such *permanent* improvements as they may have placed upon the land before the filing of this bill, the value to be fixed at the time of the surrender of possession, and to be estimated for their enhancement of the value of the real estate at that time. They will account for rents from the death of Ligon. *They are not entitled to a decree or lien for the purchase money paid to Ligon. Complainants are guilty of no fraud; they nor their mother received any of the purchase money. The defendants acquired no more than Ligon's interest. They have the covenant of Ligon, and must look alone to it.*

Decree reversed. Exceptions to report allowed. Decree here for complainants, with costs, and cause remanded.

Upon petition to re-hear, TURNEY, J., said:

Two objections only are presented by the petitioner to the opinion of the court.

First, that it holds Mrs. Ligon to have been insane at the time of the execution of the deed and her privy examination.

Second, the refusal to give lien for the purchase money paid.

The only allusion in the opinion to the insanity,

44—VOL. 15.

is the statement that after an attack of appoplexy on January 4, 1868, she was feeble, mentally and physically, if not insane.    It was not intended to decide the question one way or other.

It was deemed unnecessary to do so, as we thought the other questions decisive of the case.

A careful examination of the testimony of these witnesses, upon whom it is relied to disprove the allegation of insanity, shows that they are speaking of a time anterior to the attack of apoplexy in January, 1868.    That is, while they think it was in April of that year, it has been determined that they were mistaken as to the deed of which they speak, it being the deed of partition instead of the one now involved, and the time about December 20, 1867.

Quite a number of witnesses speak of the mental condition of Mrs. Ligon after the attack, and state facts showing conclusively that at the time of her privy examination in April, 1868, she was mentally incapable of any business transaction.    As it is not now insisted that there is error in the opinion in holding the privy examination to have been attempted in April, the testimony of the condition of Mrs. Ligon's mind at former periods does not impair in any way the testimony covering the period between January 4, and April 25, 1868, and on to January, 1871, when she died a "raving maniac."

Our statute requires that the officer taking the privy examination shall, before certifying, be satisfied that the deed is fully understood by the wife: Code, 2891, M. & V.

We have already determined, and it is not now controverted, that there was no privy examination in fact. Under the condition of Mrs. Ligon there could have been none.

It has several times been said by this court that for want of privy examination the wife's deed is absolutely void, and does not estop her: *McCallum v. Pettigrew*, 10 Heis., 394, and authorities cited.

For stronger reasons, if the wife is insane, she will not be estopped, nor in any manner prejudiced, even though there had been the formality of privy examination. No declaration of Mrs. Ligon prior to the time of the attempted privy examination can affect her rights.

Upon the second question we have been referred to numerous authorities, none of them with facts like the present case. Here the wife was stricken with apoplexy on January 4, and it was thought would die. On the next day her husband and brother were negotiating the sale and purchase. On the 11th the papers were drawn and signed; the notes were made payable to the husband. Mrs. Ligon was very ill. Nothing was said to her by her brother about the trade. The purchase price was paid to Ligon, some in money, some in check, and some in claims on heirs of Joel Fort, deceased. No part of it was paid or offered to Mrs. Ligon, nor was she in any manner consulted about its payment. No part of it was ever applied to her use or invested for her benefit. That some of it may have been paid in her presence avails nothing.

She was in the condition of a stranger to the transaction from beginning to end; did nothing and could do nothing to estop her or prejudice her rights. Her relation to the whole affair, in law and in fact, is as if an effort had been made by an entire stranger to her, and in her absence, to convert her estate.

If a sane wife is not estopped by her deed for want of privy examination, by what rule are we to estop one who is incapable of attention to any business transaction?

There is not even a pretense that any act of hers induced her brother, the purchaser, to accept the deed, execute his notes and pay them to the husband. He was in good health and of sound mind; she in bad health, with a mind paralyzed by apoplexy, growing worse daily, until she died a "raving maniac."

None of the requirements of the law necessary to deprive her of title have been observed.

To hold that her estate is liable to repay the purchase money would be to put it in the power of every purchaser to defy law and absorb estates of married women, whether sane or insane. If to relieve her works a hardship, it is a hardship brought about by the purchaser. He had every opportunity to know what he was doing and the chances he was taking, and must abide the results of his venture. It is claimed he was guilty of no fraud, nor was his sister, nor are the complainants, and being equal in this respect, the law must prevail. In the absence of positive fraud the parties would not occupy equal grounds. The purchaser, over every opportunity to

Garth and Buckman *v.* Fort.

know the facts, negotiated and traded with the husband, without consultation with the wife at the time the law demanded he should, in order to protect himself. To say the least, his conduct was culpable.

At the time the papers were signed, he said nothing to his sister on the subject. Her husband asked her if she was willing to sell the land; she said to him, "Do as you please with the land," that she had nothing to do with it. The husband says he thought her signature was only a formality. The brother knew of her condition on January 4 and 11, was at her house on both days. All his conduct goes to prove that he cared nothing for her signature, that he too thought it a mere formality, and therefore ignored her in his negotiations to their consummation with the husband.

Whilst the family was attempting to conceal the derangement of Mrs. Ligon, it was talked of in the neighborhood and reported through the country.

E. J. Fort, the uncle of the purchaser, who told him about the negotiations, told his nephew "when the papers were being drawn up to be very particular and have everything done according to law, lest his title be disturbed on account of the rumors of the derangement of Mrs. Ligon's mind." E. J. Fort had heard of it some time before he heard of the negotiations for sale and purchase.

Dismiss petition.